# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

Catherine Ferreira

v.

Framingham Housing Authority
U.S. Dept. of Housing and Urban Development
CCO Mortgage
Citizens RBS Financial Group Inc.

CIVIL ACTION
NO. 14-CV-40056


## **COMPLAINT**

1. Plaintiff Catherine Ferreira (hereinafter "Plaintiff"), makes the following allegations against Defendants Framingham Housing Authority (FHA), United States Department of Housing and Urban Development (HUD), and CCO Mortgage (CCO), RBS Citizens Financial Group Inc (RBS), (hereinafter "Defendants FHA, CCO, HUD or RBS").

### **Parties**

2. The plaintiff is a resident of Worcester County, Massachusetts and is a citizen of the United States.

3. The defendant FHA is a local Public Housing Agency (PHA) operating in Massachusetts.

4. The defendant CCO is a mortgage and lending servicing company headquartered in Glen Allen, Virginia and conducts business operations in Massachusetts.

5. The defendant HUD is a Unites States federal agency that governs and funds federal housing programs through local PHAs.

6. The defendant RBS is headquartered in Providence, Rhode Island and conducts business in Massachusetts, the defendant CCO is a division of defendant RBS.

7. Plaintiff is ignorant of the exact organizational relations of the defendants but will amend this complaint when ascertain.

## Jurisdiction

8. This court has jurisdiction over this matter pursuant to 28 U.S.C. 1322.

9. Venue is proper because the causes of action stated herein arose in this judicial district and the venue is also where

(a) the plaintiff resides

(b) the defendant FHA administers federal housing programs in Massachusetts

(c) the defendant CCO a mortgage company which conducts business in Massachusetts

(d) the defendant RBS is a financial institution which conducts business in Massachusetts

(e) the defendant HUD is a United States Agency

## Facts

10. On October 12, 2000 HUD implemented the "Homeownership Option" section 8(y) of the United States Housing Act of 1937, as amended by section 555 of the Quality Housing and Work Responsibility Act of 1998. The Homeownership Option allowed Public Housing Agencies to provide Section 8 tenant-based assistance to eligible families for homeownership purposes.

11. In May 2001 the Plaintiff, a single mother of four children, graduated with a Masters degree in Regional Economics and Social Development from the University of Massachusetts Lowell and begun working full-time. She was a recipient of the Section 8 tenant-based housing program administered by the defendant FHA.

12. In 2002 the plaintiff was offered the opportunity to participate in the Section 8 Homeownership Program. The defendant FHA stated that she was selected because she was a participant of the Section 8 Framingham Self Sufficiency (FSS) program. The plaintiff was giving an outline of the program rules. A true and correct copy of the Steps

to Homeownership is attached hereto as Exhibit "A." The plaintiff was told the mandatory home buying counseling classes would begin on July 26, 2002. In the classes the plaintiff would learn more about the program and purchasing a home for her family.

13. The plaintiff completed the home buying course in early September 2002. The plaintiff was ready to apply for a mortgage and conduct a housing search. Contrary to 24 CFR 982.632 and what she learned in class the plaintiff was not allowed to "shop around" for a lender. A true and correct copy of the home buying class material is attached hereto as Exhibit "B." The plaintiff was told exactly which loan officer of the defendants RBS to contact to apply for a mortgage. In addition she was told she would receive a 0% interest loan for up to $20,000 from the same organization that provided the home buying counseling Neighborhood Housing Services of Quincy, Massachusetts. The "grant" was due upon sale of the property. The Plaintiff cannot recall filing out an application to apply for this grant. The Plaintiff asked the defendant FHA "what is the cap on the amount she could pay for a house." She was told by the defendant FHA representative that there was none and that she could "use whatever the bank lets you borrow" as the cap.

14. On October 24, 2002 the plaintiff obtained pre-approval credit terms from Citizens Bank for $228,000 or a maximum monthly housing payment of $1,682.51. There were a number of conditions for approval checked off, one of which was obtaining a grant for $20,000 from the Neighborhood Housing Services of Quincy, Massachusetts. The offer was good until November 30, 2002. A true and correct copy of the Pre-Approval is attached hereto as Exhibit "C." On or about December 12, 2002 the plaintiff received the

mortgage approval from the defendant RBS. A true and correct copy of the Mortgage

Approval is attached hereto as Exhibit "D."

15.  Plaintiff located a house located at 9 Fairview Rd in Westborough, Massachusetts that

she was interested in purchasing. The plaintiff notified the defendant FHA about finding

the property. An offer to purchase the property for $240.000 was accepted. The purchase

and sales agreement was signed on November 27, 2002. As required by the defendant

FHA the plaintiff hired two inspections, a HUD inspector and a private contractor.

Neither inspector noted that the furnace was a rental unit that needed to be replaced soon

or that the baseboard heaters in the newly renovated basement were not connected to the

furnace. There was no mention that the wall to wall carpeting in basement in a wet land

area was a potential problem. The exposed electrical wires or the electrically outlets that

were not hooked up to the electricity were also overlooked. The finished basement where

three of the four children of the plaintiff's would sleep was not up to housing code and

considered" illegal."

16.  The private inspector noted some major structural issues. The sill plate in the garage was

rotted and the connecting breezeway floor lack access to inspect it properly. The rot was

evidence of termite damage but due to the cold weather the inspector could not state if the

termites were active at the time. The roof also needed to be replaced in the near future.

According to the Homeowners Program regulations the Housing Agencies need to review

the inspector's reports and have final approval on the affordability and condition of the

home. The plaintiff never received any support or advice from the defendant FHA on the

affordability of house and/or about the results of the inspections. It was just approved
without discussing either aspect. The plaintiff closed on house Dec 30, 2002. A true and
correct copy of the Settlement Statement is attached hereto as Exhibit "E."

17. Almost immediately Citizens Mortgage assigns sells or transfers the servicing of the
plaintiffs mortgage loan to Dovenmuehle Mortgage Inc, Schaumburg, Illinois effective
February 1, 2003. A true and correct copy of the transfer notice is attached hereto as
Exhibit "F." The mortgage is again sold or transferred to the defendant CCO sometime in
2007.

18. In the introduction of the final rule on September 12, 2000 Defendant HUD stated that
"homeownership assistance payments may be made directly to the family or lender on
behalf of the family. (Two-party checks to the family and lender are not authorized
because such a practice is incompatible with typical lending documents and practices)."
24 CFR Parts 5, 903 and 982

19. The defendants FHA choose to pay the lender directly and told the plaintiff to make her
payment directly to the lender. The result is a two-check system that has proven to be
incompatible since the plaintiff's first mortgage payment and continues to be problematic
for her to receive effective loan servicing to this day. In addition, this process
emphasizes the public assistance the plaintiff receives, distorts the line of who is the
mortgagor, and provides a system were confidentiality is compromised.

20. The plaintiff mortgage account had similar lending practices issues and errors with both Dovemuehle Mortage and the defendant CCO. Mortgage payments were required to go to a different mailing address than the one most costumers used. Delays in posting payments, accounting errors, and falsely accusing the plaintiff of late payments are a common theme. The plaintiff is ignorant if the two-payment system caused every issue and error but the pattern of practice is consistent between the two companies and continues to this day with the defendant CCO. A historical illustration of accounting errors began in 2002 when the plaintiff's payments were being credited to another Section 8 homeowner's account and her account was in recorded in non-payment status.

21. The defendant FHA held a meeting with the group of Section 8 homeowners at their Framingham office approximately a year after the plaintiff closed on her property. The homeowners got to hear about the homes their peers had bought and the hopes and challenges each faced. Everyone seemed to be experiencing accounting issues and errors with the mortgagee. The plaintiff felt better to be laughing rather than crying over the frustrating experiences she had trying to correct the accounting errors. She even joked when she met the woman who she was "paying her mortgage payments." The plaintiff's memory is that the women were eager to get together again and wanted to share contact information. The defendant FHA however had different ideas. The sign in sheet was taken and the group was never brought together again.

22. During 2004-2005 the plaintiff was laid off from her job collected unemployment and began a new position. While collecting unemployment the plaintiff's housing payment

was reduced. The plaintiff understood that when her income decreased the defendant FHA payment subsidy increased. The plaintiff's mortgage rate was 6.25%. Interest rates had decreased significantly in the previous two years. Lowering the rate would make the home more affordable. The plaintiff asked the defendant FHA about refinance her current mortgage. She was told refinancing was not a possibility because it was difficult enough to get the bank to agree to the homeownership program to begin with. The defendant FHA further stated that keeping them {the bank} on board was difficult and refinancing was impossible. According to the Homeownership Option regulations the plaintiff should have had the opportunity to refinance with a mortgage lender of her choice. By not allowing the plaintiff the opportunity to refinance the defendant was denying the plaintiff the right to make her home more affordable while ensuring that the defendant CCO collected more money from the plaintiff and the U.S. government over the years.

23. As with refinancing the plaintiff accepted the defendant FHA's word as the rules and regulations of the program. To her knowledge she was only provided a broad overview of the program and was never given a copy of the Homeownership Option/Program regulations prior to buying her home. For instance she did not know about the regulations for providing accommodation for a disabled family member. When she bought her home in 2002 her oldest son was deaf. It would have been very practical to have fire alarms and a doorbell to accommodate his deafness. Or when the plaintiff's disabled wheelchair bound mother moved in to the family home in 2007 a proper wheelchair ramp could have made all the difference in her staying in the family home vs. going into a nursing home because the plaintiff could not find funding for the accommodations.

24. In 2007 the plaintiff was not receiving monthly mortgage statements and there had been some questionable accounting payment errors/issues with her account. According to the defendant these errors had been taken place for a year beginning in July 2006 with the former lenders records. A true and correct copy of the result of the audit is attached hereto as Exhibit "G." She tried and failed to resolve these issues directly with the defendant CCO. She also requested the assistance of the defendant FHA in resolving the matter. These efforts were unsuccessful. The plaintiff utilized her consumer rights and filed a complaint with the Office of the Comp Controller.

25. The defendant CCO mortgage resolved the issue by conducting an audit on the plaintiffs account in both their records and in Dovenmuehle's records. There were errors in both lenders records. An audit conducted by the same company making the errors was not reassuring to the plaintiff. How was a mortgage transferred with accounting errors in place when mortgage companies are required by law to audit their accounts annually? The plaintiff remains uncertain if her account was accurately recorded and adjusted. A true and correct copy of the company's response is attached hereto as Exhibit "H."

26. The plaintiff's relief at resolving the issues was overshadowed by an angry call from the defendant FHA representative Rosemary Garneau shortly after the OCC complaint was resolved on or about October 23, 2007. A true and correct copy of the letter from the OCC is attached hereto as Exhibit "I." The plaintiff was warned that her actions, filing a complaint with the OCC, had threatened the whole Section 8 Homeowner program. The

plaintiff was forbidden to ever take such action again. The plaintiff had never told the defendant FHA of the complaint it stood to reason that the defendant CCO did. This is one of many instances where the plaintiff felt the two defendants worked together against the plaintiff's interests and rights.

27. Erroneous late charges' resulting in fees assessed is a frequent problem. At least twice a year since the defendant CCO began servicing the mortgage in 2007 the plaintiff has been wrongly accused of being late. The time and effort the plaintiff spends on correcting these errors is considerable. The mental anguish and stress in correcting and dealing with these false accusations is immeasurable. When the Plaintiff tries to find out how these errors occur continuing to occur the defendants blame each other for the errors. The Special Loans representative of defendant CCO states that the defendant FHA failed to do her job in reporting payment changes and vise versa. Regardless of who did or did not do what errors continue to happen and the plaintiff suffers and pays literally and figuratively.

28. Late payment charges also result in erroneously reports of non-payments and mortgage defaults to the credit bureaus by the defendant CCO. In February, March, and May of 2011 the defendant CCO accessed late charges, notified the plaintiff of loan default and resulting consequences and reported her to the Credit Bureau. A true and correct copy of these notices and warnings are attached hereto as Exhibit "J" "K" , "L", "M" and "N" Late charges also occurred in July 2012 and February 2013. True and correct copies of these notices are attached hereto as Exhibit "O" and "P."

29. Financial repercussions of these false reports are difficult to measure. The plaintiff credit score is affected. Third parties screening her credit do not know the late payments and defaults are false. Solicitation by businesses and people that prey on people in pre-foreclosure begin by mail and phone after these reports are filed. On one occasion Lowe's Home Improvement closed the plaintiff's credit card upon sighting the mortgage default as the reason for doing so.

30. The majority of the time the plaintiff had any problem or issue with her mortgage account she would need the defendant FHA's assistance in resolving it. It appeared that the defendant CCO considered the defendant FHA as the mortgagor. The plaintiff like any other consumer would call the costumer service line of the defendant CCO to resolve any issue or question she may have with her mortgage. But more often than not the plaintiff could not solve her own account issues and had to call the defendant FHA to resolve it for her. Of course because it was actually the plaintiff's mortgage the defendant FHA would then call the plaintiff back and tell her what documentation if any was needed by the plaintiff and what was needed to be done to resolve the issue. One of the reasons that the defendant FHA has more success in resolving the plaintiff's account issues is because of direct access to the Special Loans department of the defendant CCO. The Special Loans department services the plaintiff's loan but she is denied direct access to this department.

31. The undermining of the plaintiff rights as the mortgagor and consumer has always been nerve-racking, frustrating, and quite puzzling to the plaintiff. During the last couple of years the plaintiff could not turn to the defendant to fix and/or dispute any issues she had with the defendant CCO. The plaintiff is the mortgagor yet she had great difficulty resolving even the simplest issues on her own account. The information she does receive by phone from costumer service is incomplete, incorrect and conflicts with written materials. The defendant CCO representatives are unfriendly, rude, and openly hostile to the plaintiff.

32. The plaintiff thought that one reason customer service personal and the special loans person is so rude to her was because of a regional location issue. Specifically that her Yankee/Boston accent possible bothered the Virginia based representatives. But during a call on February 23, 2014 to the defendant CCO's customer service number "Maggie" stated "oh you're a Section 8 case" in a disdainful tone to the plaintiff. The plaintiff now believes that her subsidy, her "public assistance," status is noted on her account or is identifiable in some way by the defendant CCOs representatives. It explains the derogatory treatment the plaintiff receives. This type of discriminatory practices violates banking and lending laws.

33. In December 2007 the plaintiff was unable to function or cope on a daily basis at home or work. She was a new employee in a small non-profit organization and had no sick or disability leave benefits. Health insurance coverage had just begun that month. The plaintiff requested some time off without pay and sought medical attention. The

plaintiff's primary doctor initially diagnosed her with severe depression and referred her to specialist for the physical pain and other symptoms she was experiencing. During the next several months the plaintiff would see a Rheumatologist, Neurologist, Physiatrist, and Infectious Disease Physician and undergo many tests and procedures.

34. In June 2008 under the advice of doctors the plaintiff applied for United States Social Security Disability benefits for Bipolar Disorder and Fibromyalgia. During this time period the plaintiff notified and reported her income changes and health statue to the defendant FHA. These income changes included the loss of wages and the addition of Temporary Assistance to Needy Families (TANF) benefits.

35. The plaintiff's health status at this time was very dire. Adjusting to and trying different psychiatric medicine is a difficult and trying process. The physical issues were taking a toll on the plaintiff as well. The plaintiff was in therapy weekly to come to terms with her limitations and with a mental illness. Dealing with the feelings of the inability to cope and function like you had before and feeling betrayed by your brain and body is an ongoing process. There were also the financial losses and struggles to come to terms with too. Learning that you cannot currently work and if and when you do it may be in a very different capacity as before is quite a blow to someone who had worked so hard for her college degree and financial independence.

36. As the plaintiff struggled with her financial and health losses during 2008, 2009 and beyond the defendant FHA questioning her on when she would get a job and when she

was going to return to work. Every time there was any contact between the parties this questioning around jobs and work would take place despite the fact that the plaintiff had medical documentation for not working and had filed for disability with the government.

37. At first the plaintiff would just answer that she did not know. That at that time she was barely functioning on a day to day basis. But over time the questions from the defendant FHA began to really bother the plaintiff who was mentally trying to except the fact that she could not currently work and focus her energies on positive accomplishments and successes.

38. The defendant FHA also began to include telling the plaintiff that she needed to think about selling her house because she could not work and could not afford the house anymore. The plaintiff was scared and confused she knew the home buying program assistance ended after 15 years but why was the defendant FHA pushing her to sell now. Prior to her getting sick the defendant never mentioned selling the house. The only difference now was she could not work, she was disabled, a personal and financial failure. The plaintiff internalized these statements and messages. She like the defendant FHA blamed herself for being sick and poor. She found herself worrying and focusing on the house when her energies needed to be on her health and how her illness was affecting her son.

39. The questioning about going to work and losing the house were constantly being replayed in the plaintiffs mind. Instead of focusing on learning what she could still do the plaintiff

stayed fixated on what she could not do, work and earn an income, afford her house. She blamed herself for getting sick. This internalization kept the plaintiff from viewing the inappropriateness of the defendant's behavior. And kept her from questioning if this behavior violated any her civil rights and/or any disability laws.

40. On or about May 2009 the plaintiff was required by the state of Massachusetts to complete a disability review in order to continue to receive TANF benefits. The determination process included a review of the plaintiff's medical records, a medical examination and evaluation by an appointed state approved Physician and Physiatrist. The plaintiff provided a copy of the final report confirming her disability status to the defendant FHA with no regard to her own medical privacy or HIPPA laws. The plaintiff believed that by giving the defendant FHA this report that she would no longer be harassed about returning to work and/or selling her home.

41. The state disability report did not change the behavior of the defendant FHA who seemed focused on removing the plaintiff from the Section 8 Homeownership program because of her disability, because her fixed income required a higher subsidy payment from them. On or about January 30, 2010 the plaintiff received a "Lease Rider" agreement to sign in the mail. The agreement was effective February 1, 2010 on it was two sticky notes. One stated "Please sign…" the other "Cathy, Your initial mortgage amount was $228, 000. You can call CCO + see what the payoff figure is. Remember we only assist you for 15 years after that you are responsible. We are already in year 9. Let me know if you want

any help in going back to your voucher. Regards, Rosemary." A true and correct copy of this Lease agreement with notes is attached hereto as Exhibit "Q."

42. When the plaintiff bought her house she was eligible for homeownership assistance for 15 yrs or until 2017. However disabled homeowners are provided an exemption from the terms of assistance requirements of the Section 8 homeownership program. Thus the plaintiff is and has been except since becoming disabled in 2008. When the defendant FHA wrote the note to the plaintiff and every time the term of assistance was mentioned to the plaintiff over the phone the defendant FHA was knowingly providing false information to intimidate the plaintiff. This ending of assistance was always framed to show the plaintiff that she could not afford the home on her disability income so she might as well sell it now. These terms along with the other program regulations are known by the defendant and are written in their own Section 8 Homeownership Program Administrative Plan required by defendant HUD. A true and correct copy of the plan is attached hereto as Exhibit "R."

43. The pressure to sell their home was overwhelming the plaintiff and her son. The plaintiff would of given into this pressure had it not been for the fact that her and her son were both experiencing debilitating physical and mental health issues. Also the housing market was very low for sellers and the physical condition of the house was unlikely to net a sale to cover the existing mortgage and a move. Thoughts of losing her family's home were interfering in the plaintiff's struggle to maintain her own stability and to assist her youngest child in his. He was having a extremely difficult time in his second year of high

school. The threat of losing their home was creating more instability in his life. The plaintiff felt harassed and threatened by the defendant FHA. These worries, concerns and fears were so severe that the plaintiff never contacted the defendant FHA unless absolutely necessary.

44. During the year 2013 the plaintiff had a large amount of unreimbursed medical expenses. These expenses are deductible expenses under Section 8 and the plaintiff provided the necessary documentations to the defendant FHA. In July 2012 the plaintiff began to question why these medical expenses did not seem to make a difference in her new payment amount as they had in April 2012. She was also confused why the Special Loans representative at CCO mortgage had provided her with her new payment amount verbally by phone rather than the plaintiff receiving a written lease rider from the defendant FHA like she had since 2002.

45. On July 12, 2012 the plaintiff was notified that her account was "suspended" as a result of an insufficient payment. See Exhibit "O." The unorthodox behavior of the defendant FHA and CCO combined with the fact that the plaintiff's account was suspended made the plaintiff believe the parties were in collusion against her. She was deliberately forced into a situation that suspended her mortgage. She contacted the defendant FHA and demanded that her account be corrected and a written lease rider be mailed to her. The signature dates, 7/26/12 for the defendant and 8/15/12 for the plaintiff, on the lease rider confirms it was completed well after the effective date of July 1, 2012. A true and correct copy late Lease Rider is attached hereto as Exhibit "S."

46. On August 15, 2012 the plaintiff wrote the Leased Housing Director of the defendant FHA to make a formal written complaint outlining the recent events and accusing the defendant FHA of discriminated against her due to her disability 42 USC 12132. A true and correct copy of the written complaint is attached hereto as Exhibit "T." A response from the defendant FHA arrived by mail on or about August 31, 2012 scheduling a meeting for September 11, 2012. A true and correct copy of the response letter is attached hereto as Exhibit "U."

47. Due to medical complications and erupt discontinuation of a moos stabilizer the plaintiff was emotionally unstable at the time of the meeting on September 2012. She cried uncontrollably throughout the meeting. There was no mention of rescheduling the meeting to a better time and/or the plaintiff's right to have representation present. The meeting was not investigatory. It was not focused on any of the plaintiff's allegations. The agenda was the mortgage being too high. Selling the house and/or lowering the mortgage were the solutions. The plaintiff was assured that the defendant FHA was trying to help and would lead the efforts to lower the mortgage. The Plaintiff tried to explain all the code violations in her home including a rotted breezeway/porch that made a three foot drop before the second exit of the house and the mold issues with the basement. The defendant FHA representative responds was that a "short sale" on the home was possible. The plaintiff was told that by modifying the loan and removing the PMI the mortgage it would be affordable. It was agreed that the defendant FHA would begin this process.

48. On or about September 17, 2012 the plaintiff received a letter from the defendant FHA to call the defendant CCO and request the removal of PMI and a modification application. A true and correct copy of the letter to the plaintiff is attached hereto as Exhibit "V." The plaintiff made the call and spoke to "Valarie" in costumer service to request PMI removal and spoke to Loss Mitigation and requested an application for modification. The defendant CCO responded to this request by mailing procedure rules for PMI removal. A true and correct copy of the removing PMI letter is attached hereto as Exhibit "W." A modification application was sent by Fed Ex. The plaintiff's monthly mortgage statements were also stopped.

49. When the plaintiff reviewed the modification application she understood for the first time that it was a foreclosure prevention measurer and was very concerned that if she proceeded she could lose her home. Just requesting the application stopped her mortgage statements. What would happen if she proceeded? Was the defendant FHA setting her up for foreclosure?

50. The plaintiff's depressive state was growing deeper and deeper during this time. Worrying over the house, finances, and health issues were all overwhelming the plaintiff. The defendants FHA and CCO appeared to be working in collusion. The plaintiff believed that she was going to be forced out of her home one way or another. She did not complete nor submit the modification application. By the end of January 2013 the defendant was in severe depression and suicidal. In early February she was admitted into a mental health hospital followed by a 10 day out-patient treatment program.

51. During this period in January 2013 the plaintiff was having her yearly redetermination review with the defendant FHA. The scheduled change was would be effective February 1, 2013. The plaintiff's son was turning 18 that month and his total income would be counted as household income. The plaintiff wondered why the payment changes took place before her soon actually turned eighteen and without the required notification time period being honored. Without this time period it would be more difficult to prepare for the loss of social security dependent income, child support, and the shift to depending on her young son for financial support. The plaintiff received the new lease rider on or about January 23, 2013. A true and correct copy of the Lease Rider is attached hereto as Exhibit "X."

52. During the first week of February 2013 the defendant FHA called the plaintiff to inquire if she signed the new Lease Rider. The plaintiff was extremely distressed when she took the call and was in the process of looking for legal representation when the defendant FHA called. She told the defendant that she was taking this action and hung up. The defendant FHA called the plaintiff back a couple of hours later to report that changes were made in the calculations and the plaintiff's payment was lowered by $235.00. A new Lease Rider requiring her signature was being mailed to her. A true and correct copy of the second Lease Rider for February 2013 is attached here to as Exhibit "Y" This change in calculated the plaintiff housing payment confirmed her fears that it was being done arbitrarily and could be used to make it unaffordable or not.

53. During the hospitalization outpatient program in January and Feb 2013 the plaintiff prioritized taking care of herself, her housing situation, and finances. She spoke to legal counsel about her allegations of harassment and discrimination by the defendant FHA and CCO. The plaintiff was referred by the attorney to a HUD certified foreclosure prevention program and was assured that the mortgage company would not foreclose on her property during a modification as long as payments were up to date.

54. The foreclosure prevention class began on March 6, 2013. A true and correct copy of the workshop notification is attached hereto as Exhibit "Z." After the workshop the plaintiff met with a Housing Counselor and learned that the decision of qualification could not be made until all the required documents were collected and the credit report fee was paid. The plaintiff gathered all the required documents, wrote the cover letter and check for the credit report fee. A true and correct copy of the cover letter is attached hereto as Exhibit "AA." After the materials were accepted an appointment was set-up on April 10, 2013 to meet with the Housing Counselor.

55. At this meeting the Housing Counselor stated that she had never had a section 8 subsidized mortgage in her seven years doing modification and was not sure how the bank would handle the subsidy or how the subsidy was calculated by the defendant FHA. The plaintiff signed authorization forms granting the Counselor permission to speak to each party. The Housing Counselor called the loss mitigation department of the defendant CCO in the plaintiff's presence that day. She learned from the defendant CCO that the current subsidy amount would be viewed as the plaintiff's income. HUD calculations

determined that the plaintiff would qualify for a modification and the completed
application was submitted to the defendant CCO.

56. During this meeting the plaintiff explained how she had been trying to remove PMI and
was unsuccessfully. The Housing Councilor called the defendant's customer service
department in the presence of the plaintiff to see if she could assist. The costumer
services representative was rude and uncooperative. The Counselor explained she was a
HUD certified counselor for many years and had never seen a monthly mortgage
statement not show exactly how much to what was being paid by escrow. She wanted to
know how much PMI cost so she could assist the plaintiff. The customer service
representative stated that the defendants CCO mortgage statements were always like that.
The plaintiff handed the Counselor an older statement contradicting the representative's
statement. The Councilor told the defendant CCO representative that the plaintiff had just
handed her an older statement and it contained the needed breakdown. The customer
service representative replied that she would note the account and someone would look
into updating the statement. The appointed time was up the Counselor told the plaintiff to
write to the company to request removing PMI again.

57. Removing PMI was a very difficult process. The defendant CCO would not grant an
automatic removal and had ignored a written request from the plaintiff on February 26,
2013. A true and correct copy of a written request to remove PMI is attached hereto as
Exhibit "BB." After the Housing Counselors call on April 10, 2013. The defendant CCO
sent the plaintiff four different letters concerning PMI on April 11, 2012. One of the

letters was the steps to take to remove PMI the other three included reasons given for not removing PMI. Different items were noted on each letter, including a delinquent payment history, late fees owed (but the amount was not noted), no written request was received, and no evidence of the value of the property. A true and correct copy of these four letters is attached here to as Exhibit "CC, DD, EE, and FF."

58. On April 12, 2013 the defendant CCO sent a response from a written request that was received on February 11, 2013 and March 6, 2013. February's request was regarding statements not being received and March's was PMI removal. A true and correct copy of this response is attached here to as Exhibit "GG." Two more requirements for deleting PMI also arrived that day. A true and correct copy of these letters are attached here to as Exhibit "HH" and "II."

59. During this time the plaintiff finally received assistance from a representative in the PMI department at defendant CCO. By working with one contact person she was able to learn the dates she was being accused of being late, provide documentation to prove these were errors, prove she had provided a written request, and obtain the required AVM appraisal. PMI that should have been removed back in November 2012 was finally removed on April 12, 2013. A true and correct copy of the PMI removal letter is attached hereto as Exhibit "JJ." On March 15, 2012 the plaintiff received another letter from the defendant regarding PMI. This letter like others before checked off the reasons PMI was not removed. A true and correct copy of the PMI removal letter is attached hereto as Exhibit "KK."

60. The plaintiff's monthly mortgage statements were stopped without explanation on or around November 2012. Verbal request made by the plaintiff to reinstate the monthly mortgage statements were ignored. On February 5, 2013 the plaintiff sent a written request to reinstate her statements and an explanation of her failed attempts to get them reinstated verbally to the defendant CCO. A true and correct copy of written request is attached here to as Exhibit "LL." On February 11, 2013 the defendant CCO sent a response to the plaintiff stating that the results of an investigation would be sent within 30 days. A true and correct copy of written request is attached here to as Exhibit "MM." The results from the defendant CCO received on March 12, 2013 do not even mention the months that were in question November 2012 – February 2013. See Exhibit "GG."

61. Before the suspension the plaintiff received two statements in both July and August 2012, and one in September 2012. In July and August the second statement received appeared to contained corrections and/or additional information from the first statement received. These statements also displayed a number of "reversals." PMI payments of $171.00 per month stopped being shown after August 2012. A true and correct copy of these mortgage statements is attached here as Exhibit "NN, OO and PP." When the statements resumed the first four months, February through May 2014, contained a $38.00 escrow item that the plaintiff had never seen on the statements before. A true and correct copy of these mortgage statements are attached here as Exhibit "QQ, RR, SS and TT." The plaintiff recalled that a previous suspension of monthly statement had happened due to accounting errors that resulting in an audit of the account.

62. In a letter dated May 1, 2013 from the defendant CCO's Relationship Manager, Bill Byrd introduced himself as the plaintiff's "single point of contact for mortgage assistance." Anytime the plaintiff called the defendant CCO she would be automatically transferred to Bill Byrd. A true and correct copy of the notice from Bill Byrd is attached here to as Exhibit "UU." The plaintiff's Housing Counselor was coordinating and submitting any required documentation to the defendant CCO and was the plaintiff's key contact person.

63. On June 26, 2013 the defendant CCO sent a modification denial letter to the plaintiff due to the "credit application incomplete." A true and correct copy of the denial notice is attached here to as Exhibit "VV." After the denial the plaintiff learned that what she received in writing was different than what was explained by phone. Furthermore what the defendant CCO representatives told the Housing Counselor was different than what the plaintiff was told.

64. On or about July 2, 2013 the plaintiff received a letter from the defendant FHA. In this letter the defendant FHA representative explained how she had talked about the plaintiff's financial situation with the president of a neighborhood organization and a bank loan officer about refinancing. The plaintiff had never discussed refinancing with the defendant FHA since her request in 2005. The plaintiff certainly did not grant permission for the defendant FHA to release her personal information to the two parties identified in the letter. A true and correct copy of the letter is attached here to as Exhibit "WW."

65. The plaintiff was extremely distraught at the breach of her confidentiality. She had wanted to refinance the mortgage at a time when she was working and the housing economy was perfect to do so but was denied. She had recently appealed a modification denial based on her income being too low. It was highly unlikely that a bank would approve a refinance. Additionally if the defendant FHA was truly supporting the plaintiff in refinancing the loan that approach would be taken before a modification request not after. And certainly not during it. The plaintiff sent a copy of the letter to the attorney and focused on the modification appeal.

66. At the end of July 2013 the defendant CCO Bill Byrd requested some updated documents from the plaintiff. These documents were provided and sent in by the Housing Counselor. On August 8, 2013 the plaintiff was called by a defendant CCO representative named "Allison" looking for the requested documents. The plaintiff stated that they were sent in by the Housing Counselor. The defendant CCO Allison stated she could see a note that" processing received something on August 9, 2013,"she will see if it is the documents and get back to the plaintiff.

67. On August 21, 2013 "Allison" calls the plaintiff again and notifies her that no documents were received. The plaintiff asks to speak to Bill Byrd and is told that he no longer works in his former position. The plaintiff is told that Allison is the "temporary Relationship Manager" but refuses to put it in writing when asked by plaintiff to do so. Allison's states

that her last name is Lasstier. The plaintiff tells her that she will notify the Housing Counselor of the changes and have her resend the requested documents.

68. On August 21, 2013 the plaintiff writes to the defendant CCO requesting the name of the new Relationship Manager assigned to manage her modification. A true and correct copy of the written request is attached here to as Exhibit "XX" The defendant CCO never responds to this request. Christine Maddox seems to be the contact person of the defendant CCO for the remainder of the modification application process.

69. On September 9, 2013 the plaintiff received a second denial notice from the defendant CCO for debt to income ratio. A true and correct copy of the denial notices are attached here to as Exhibit "YY and ZZ" By phone the plaintiff is told she does not make enough money to qualify for modification. When the Housing Counselor speaks to the defendant CCO representative she learns that the plaintiff's housing subsidy was not considered in the modification application.

70. The defendant CCO representatives now state that the only way the subsidy could be included is by providing proof of subsidy in a written letter from the defendant FHA. On September 19, 2013 the plaintiff called the defendant FHA and left a voicemail requesting subsidy verification to be faxed to the Housing Counselor. The plaintiff recalls the defendant FHA and is told that a subsidy notification was sent to the Housing Counselor. The letter was received and was submitted to defendant CCO along with a verbal request from the plaintiff to use the subsidy in appeal considerations.

71. On October 1, 2002 the defendant CCO representative Christine Maddox leaves a voicemail for the Housing Counselor. The Housing Counselor calls the plaintiff about the missed call and tells her to return the call because she will be out of the office for a few days. The plaintiff returns the call that same day and leaves a voicemail for Christine Maddox, defendant CCO explaining she is returning her call and is inquiring if any further documentation is needed. The plaintiff's calls are never returned.

72. On October 2 and 3, 2013 the plaintiff receives modification denial notices. The same reason, debt to income ratio, is noted for the denial. A true and correct copy of the denial notices are attached here to as Exhibit "AAA and BBB."

73. On October 12, 2013 the plaintiff spoke to "Kendra" in Loss Mitigation at defendant CCO about the recent modification denial. The plaintiff is told that she was denied because she makes too much money, is not in "imminent default," and had been making payments above the "principle payments" required since April 2013.

74. At that time the plaintiff was still paying the same payment amount that she was paying prior to PMI being removed. Beginning in May 2014 the mortgage was lower but the defendant CCO never notified the plaintiff what the monthly mortgage was without PMI. Thus the plaintiff could not submit the lower mortgage amount to the defendant FHA for adjustments/changes. The defendant FHA calculates and determined the plaintiff's payment amount not the defendant CCO. How the defendant CCO had recorded these

"overpayments" on the plaintiff's account vs. as overpayments from the defendant FHA's subsidy payment is a mystery. It was just another example of how two-payment on a mortgage is an innate failure.

75. On October 15, 2013 the plaintiff called the costumer service number of the defendant CCO to get a written statement of the total mortgage amount. She reached Loss Mitigation and was transferred to "Elise" in customer service. The plaintiff was then told that her mortgage is $455.84. The plaintiff tried to explain she wanted the total mortgage amount not her payment amount and needs it in writing. The defendant CCO representative grouchily states"$455.84 that's it." (That is the "total amount" to the customer service because she can only see the plaintiffs payment amount not the mortgage amount. How can the plaintiff have her mortgage properly serviced when costumer service only views part of the mortgage?) The plaintiff requested to be transferred to Special Loans department and was denied. She then insists on leaving a message to the Special Loan department and tells the representative to quote a note stating "what is my complete mortgage payment at this time" and to note the request needs to be in writing. The plaintiff asks when can she expect a return call and is told that "responses to receive-is 7 days but may take longer" for an answer.

76. On October 23, 2013 the Plaintiff and the Housing Counselor talk by phone. The Plaintiff notifies the Housing Counselor that she has contacted the referring attorney to inform her of the third modification denial. And has filed a complaint with the CFPB. The Housing

Counselor tells her that she will be attempted to contact Christine Maddox at defendant CCO and will get back to Plaintiff and attorney if necessary.

77. On October 28, 2013 the Housing Counselor calls the plaintiff to discuss a phone conversation she had with the defendant CCO representative Christine Maddox. Accordingly the defendant CCO stated that they refused to use the subsidy in the modification decision. The Housing Counselor informed the defendant CCO that the subsidy must be considered just like food stamps and fuel assistance is and that if the defendant CCO refuses the case will be referred to the Attorney General of Massachusetts. The defendant CCO stated that she would look into considering the subsidy further. The Housing Counselor also said she had spoken to the attorney and the plaintiff should contact the attorney's office for next steps.

78. In November 2013 the plaintiff learns from the attorney that the when the Housing Counselor spoke to the defendant FHA back in April about the housing subsidy discriminatory comments about the plaintiff were made by the defendant FHA and reported to the attorney. An affidavit of this conversation was going to be made or had been made. She explained that she was currently researching the legal history related to the Section 8 Homeowners program. She further explained that housing and/or lending discrimination were not her area of expertise and with the plaintiff's permission she wanted to discuss the case with some attorneys specialized in discrimination.

79. On November 12, 2013 the plaintiff called the costumer service number of defendant CCO to report that she had not yet received the statement she had requested, nor was her call returned from October 15, 2013. "Elisha" reported that on October 16, 2013 "something was sent to the Section 8 association." She also stated that on "November 4, 2013 there was a notation on the account, opps it's internal." The Plaintiff stated that she had requested the written statement not housing and that the written statement was still needed. The Plaintiff stated again that she wanted Special Loans to return her call. The defendant representative stated she would leave a message and that a letter would be sent within 10 days.

80. On November 13, 2013 the plaintiff was awoken by an early morning phone call from a yelling and angry "Sandra" in Special Loans at defendant CCO. She demanded to know why the plaintiff wanted a breakdown of the mortgage. The plaintiff responded that she needed to have the total payment in a written statement so she could get her new payment amount. The response was a clip "that is easy it is $455.84." The plaintiff stated that that was not the total payment. To which the defendant CCO representative stated that "she knew that" and she "was the one that tells {the plaintiff} you what to pay." She would have housing send the letter. The plaintiff responded with a "no, I need the letter from CCO so I can submit it to housing." The representative ended the call with a statement that she would speak to housing. When the call was complete the plaintiff still did not know if she would get the statement she needed. A request for a simple letter with her mortgage amount was such a difficult process and should of happened automatically after PMI was removed. A couple of days later the plaintiff received a letter from the costumer

services and special loans departments. A true and correct copy of these notices attached here to as Exhibit "CCC" and "DDD."

81. On November 14, 2013 following the advice of counsel the plaintiff called the defendant CCO Loss Mitigation department to obtain the calculations used in determining the modification denial. The plaintiff's call went straight to customer service and she spoke to "Yiisha" and asked to be transfer to Loss Mitigation and spoke to "Sumeco". The plaintiff requested a breakdown of the calculations used to determine the modification denial. She was told that she was denied because she was 60 days delinquent on her mortgage. The plaintiff thinking she is being misunderstood restates what she is requesting and is put on hold. The representative Sumeco comes back and reports that she spoke with Christine Maddox who stated that she had spoke to the Plaintiff numerous times about the denial and said all she can say. If there were more questions the plaintiff would have to speak to her supervisor.

82. The plaintiff confused because she never spoke to Christine Maddox requested the name of the supervisor. The representative Sumeco did not know and transfers the call to Christine Maddox's voicemail. The plaintiff leaves a message with her request for the supervisor's name. The call is never returned.

83. The latest accounting errors known by the plaintiff on her mortgage account occurred in October 2013. According to the defendant CCO the defendant FHA's subsidy payment

on behalf of the plaintiff was recorded as if it came from the plaintiff herself. This
payment recording error paid the mortgage in full until March 2014.

84. The plaintiff had seen the March 2014 due date on her November 2013 mortgage
statement and circled due date with a question mark with her November 1, 2013 payment.

85. On November 13, 2013 the plaintiff was called a second time by Sandra in Special Loans
of defendant CCO immediately after the first call in paragraph 51. The Special Loans
representative wanted to know how the plaintiff paid the mortgage until March 2014 and
if she paid November 1st payment. The plaintiff responded that she had not paid ahead
and had paid November's payment and explained about circling the due date. The
representative said she would look into it.

86. On November 17, 2013 the plaintiff sent a written inquiry to the defendant CCO
requesting to look into the account error. A true and correct copy of the plaintiff's written
inquiry is attached hereto as Exhibit "EEE" The defendant CCO acknowledged this
written inquiry on or about November 25, 2012. A written explanation to what had
happened and that the error was corrected was received on or about December 2, 2013. A
true and correct copy of these letters are attached hereto as Exhibit "FFF" and "GGG."

87. The plaintiff still does not understand how the error happened and what efforts were
taken to prevent a similar error from happening again. The plaintiff was once told by the
Special Loans representative that the defendant FHA monthly payment was sent to the

bank in one check for all section 8 mortgage holders. The math to pay up the plaintiff's account does not seem to add up to the explanation received for the error.

88. On or around November 2, 2013 the defendant CCO is billed for the plaintiff's annual homeowners insurance. The defendant CCO is required by RESPA to make timely escrow transfers. Yet there was no payment from the plaintiff's mortgage escrow by the due date of December 17, 2013. Resulting in the plaintiff's homeowner's insurance policy cancellation. A true and correct copy of the cancellation notice is attached hereto as Exhibit "HHH"

89. According to NLC billing a cancellation notice was sent to the defendant CCO mortgage and the plaintiff on or about December 22, 2013. The defendant CCO makes the late escrow transfer payment and the homeowner's policy is reinstated on December 24, 2013 with an outstanding $10.00 late fee balance. For seven days during the holiday season the plaintiff is home is without insurance protection because of this violation. A true and correct copy of the reinstatement notice is attached hereto as Exhibit "III"

90. On or around December 3, 2013 the plaintiff reluctantly called the defendant FHA to schedule the required yearly recertification meeting. Rather than just setting a date and holding discussions at the meeting. The defendant FHA representative asks the plaintiff "how did the refinancing go?" The plaintiff replied that there was no refinancing she had been going through a modification process. The defendant FHA replied she had no knowledge of the modification because the plaintiff never told her. The plaintiff ignored

this comment because she there was written prove and a third party witness contradicting this statement. Instead of arguing the plaintiff states that she had been denied three times for modification and there was no way a bank would approve refinancing if they would not even approve a modification of her income. An appointment was setup on or about Dec 11, 2013.

91. After speaking to the defendant FHA the plaintiff called her Coordinator at the Department of Mental Health and asked him if he could accompany her to the recertification appointment. The plaintiff did not want to speak and/or meet alone with the defendant. The Coordinator agreed to accompany her on the appointment but needed the time of the appointment to be changed. The plaintiff contacted the defendant FHA and learned that the Coordinator had already requested a change in the meeting time.

92. December 2013 is not the first time the defendant CCO failed to transfer funds in a timely manner. Although these times may fall outside the 3 year RESPA coverage time period they speak to a pattern of practice and deniability. The plaintiff's property taxes were not paid fully in 2011 and 2010 and the town issued delinquency notices. In both instances the plaintiff called the defendant CCO and was told that the taxes had been paid in full. The plaintiff took the delinquent tax notice back to the Town Hall's Collector office to inquire why she was given a delinquency notice if the mortgage company had paid the bill. The Tax Collector showed the plaintiff the tax records proving the taxes were still outstanding. The plaintiff called the defendant CCO back and an "internal investigation" was launched. The investigation would take up to 10 days. On both occasions the

investigations determined that the defendant CCO had paid the taxes. The defendant never called or wrote the plaintiff to notify her upon completion of the investigation. The plaintiff had to follow-up her own request.

93. The plaintiff unable to resolve the outstanding bills with the defendant CCO was panicked. The delinquent taxes would be reported in the local newspaper. Having experience with false credit reports the plaintiff wanted to prevent repercussions from false reports of delinquent unpaid taxes. For the 2010 taxes the plaintiff obtained an attorney from Legal Assistance resulting in the defendant CCO finally transferring the escrow tax payment the last day of the town deadline. For the 2011 taxes the plaintiff demanded to speak to a supervisor and stated that the investigation was wrong, the taxes were owed and she would get legal counsel just like the year before if necessary. The delinquent taxes were finally paid. A true and correct copy of the delinquent tax notices are attached hereto as Exhibit "JJJ" and Exhibit "KKK" The plaintiff distracted by the consequences of being reported in the newspaper for delinquent taxes never thought to question why her escrow funds were being used to pay late penalty fees on these untimely transferred escrow payments.

94. The defendant CCO sent an expiration of homeowners insurance to the plaintiff in 2007. A true and correct copy of the cancellation notice is attached hereto as Exhibit "LLL" The plaintiff is not certain if she is always notified when escrow payments are paid late. But she has had to mail in late tax notices on more than a few occasions none have gone

as far as delinquency notices as they did in 2010 and 2011 but possible have charge late fees.

95. December 2013 is the last month that the plaintiff received a monthly mortgage statement. Once again the plaintiff received two different statements in the same month. One on December 9, 2013 and December 20, 2013. The year to date interest paid was $14, 564.93 and $11, 696.32 respectively. True and correct copies of the mortgage statements are attached hereto as Exhibit "MMM" and MMM2." On or before January 31, 2014 the defendant CCO is required by the IRS to send out 1098-INT statements. The plaintiff never received a 1098-INT in January or February 2014.

96. On February 23, 2014 the plaintiff called the costumer service number of the defendant CCO to inquire about not receiving a 1098 statement, not receiving monthly mortgage statements and to report her new phone number. The defendant CCO representative "Maggie" answered the call. In response to the 1098 inquiry the plaintiff was rudely told that "no tax statement was sent because {the plaintiff} you did not pay any interest." The plaintiff said that her mortgage was paid all last year so interest must have been paid. The defendant CCO representative said off handily "oh you're a section-8 case" and placed the defendant on hold. When the representative came back she stated that the matter would be looked in to. The plaintiff asked how long it would take and was told"whenever she {Maggie} got the information." The plaintiff never received a return call nor was a 1098 mailed in response to this verbal request.

97. Regarding the monthly mortgage statement the defendant CCO representative Maggie stated that it was because the plaintiff was in bankruptcy. The plaintiff was not in bankruptcy stated this and asked to talk to someone to correct the mistake. She was transferred to the Bankruptcy Department.

98. The defendant CCO representative who answered in this department stated that there was a new law requiring the mortgage company to stop the plaintiff's monthly mortgage statements because of her current bankruptcy. The plaintiff tried to say she was not "currently" in bankruptcy but was talked over rudely by the defendant CCO representative. The plaintiff spoke louder to be heard and the Defendant CCO representative stated she would hang up if the plaintiff continued to speak so loudly. The representative did confirm it was a prior bankruptcy. When the plaintiff asked how could she could reinstate the statements she was rudely told that she "would never again receive a statement and it was {her bankruptcy} lawyer's fault." The plaintiff tried to explain that she needed statements to view her account transactions and was rudely told she could get that info online.

99. The plaintiff does not have online access and never has. The plaintiff tried to open an online account when it was first offered. She hoped it would help with the delays in posting payments and the late fees assessed on her account. The online system would not accept her account. When she called the defendant CCO for assistance she was told that online could not work with her account because there were two payments. It is just one of the examples of how she has always been treated like some kind of second class

mortgage costumer that does not have the same banking privileges and rights as other mortgagors because of her subsidy payment on her mortgage.

100. On or about February 25, 2013 the plaintiff filed a complaint with the Consumer Financial Protection Bureau about not receiving a 1098 mortgage interest statement or monthly mortgage statements and the late fee assessed from the late escrow payment. The plaintiff received a response on March 14, 2014. Basically the response was that the plaintiff's bankruptcy was not reaffirmed, the 1098-INT was sent and resent, and the $10 late fee was waived. A true and correct copy of the complaint and response is attached hereto as Exhibit "NNN"

101. On or about February 2014 the plaintiff received a call from the attorney. The attorney informed her that she could not find another legal service attorney to take the case. The plaintiff also told her that if she was filing a housing discrimination case she had three more days until the filing deadline and a few months longer to file with HUD. That was the first time she plaintiff had heard that there were filing deadlines. During March and April 2014 the plaintiff searched for a private attorney that would take her case on a contingency basis and began working on the challenge of filing a civil complaint pro se.

102. In a written statement from the Office of the Chairman of RBS Citizens to the plaintiff on March 14, 2014 it states that when "a mortgage has not been reaffirmed in a bankruptcy; the bank does not issue monthly statements as this action can be perceived as an attempt to collect a debt." A true and correct copy of the letter is attached hereto as Exhibit

"OOO" What remains so confusing to the plaintiff is the fact that other than some brief interruptions the defendant CCO has provided the plaintiff with a monthly mortgage statement post bankruptcy 2006 and also has continued to report the plaintiff's mortgage status to the credit bureaus.

103. The only time before 2014 that the plaintiff heard from the defendant CCO about her bankruptcy was on March 03, 2006 when the servicing of the loan was being moved from the bankruptcy department to regular services. A true and correct copy of the complaint and response is attached hereto as Exhibit "PPP"

104. Other than some brief interruptions aforementioned the defendant CCO has provided the plaintiff with a monthly mortgage statement post bankruptcy 2006. The defendant CCO also continued to report the plaintiff's mortgage status to the credit bureau. Both positively and negatively. Credit reporting and mortgage statements are not required after a mortgagor files bankruptcy and does not reaffirm (most likely the bank would deny the request) but it leaves a question of motive when the defendant CCO chooses to exercise this right 8 years after having not done so.

105. In the responding statement to the CFPB and to the plaintiff on March 4, 2014 the defendant claimed to have sent the plaintiff a 1098-INT and then resend it. The Plaintiff never received the 1098-INT either time and there has been no indication of problems with her mailing address. On March 27, 2014 the defendant CCO contradicted its former statement notifying the plaintiff in writing that she had never paid any interest and a

1098-INT was never issued. A true and correct copy of letter is attached hereto as Exhibit "QQQ"

106.   As aforementioned there was$14, 564.93 or $11,696.32 paid in mortgage interest in 2012 according to the defendant CCO. The plaintiff is the mortgagor. There is a formula for calculated how much interest the defendant FHA and the plaintiff paid on the mortgage. Who is suppose to calculate this percentage is beyond the plaintiff's knowledge because she cannot find any legal documentation regarding the distribution and it appears that there is no law requiring that she be provided such a notice. A search on the IRS and HUD websites fail to provide the plaintiff with this regulation or law. Calling and visiting the local IRS office also failed to produce any regulation/law. However what seems undisputable is the fact that a considerable amount of mortgage interest was paid to the defendant CCO on the plaintiff's mortgage in 2012 and no 1098-INT was issued. Even if all of that interest was decided by the defendant CCO as having come from the defendant FHA payments not the plaintiff's payments it is still mortgage interest on the plaintiff's account and a 1098-INT must be provided.

107.   On March 28, 2014 the plaintiff called the insurance agency and the billing agency regarding the homeowner's insurance policy and was told by both agencies that the $10 late fee was still outstanding. While the plaintiff was speaking to the NLC representative the defendant CCO called to inquire about the late fee. This date is two weeks after the defendant CCO reported to the CFPB that the fee was waived and two months after the

charge occurred. The plaintiff questions the ethical and legal manner in which the lender

appears to conduct its business practices in regards to her account and escrow.

108.   On March 28, 2014 the plaintiff sent a qualified written statement to the defendant CCO

to clarify the discrepancies and/or further explain the issues that have transpired over the

last several months. A true and correct copy of the QWR is attached hereto as Exhibit

"RRR." A response notification from defendant CCO and defendant RBS was received

on or about April 2, 2014 and April 7, 2014 respectively. A true and correct copy of these

letters is attached hereto as Exhibit "SSS and TTT."

## **Relief**

WHEREFORE, the plaintiff demands judgment against the defendants for damages and

such relief as this court deems just.

Catherine Ferreira

9 Fairview Road

Westborough, MA 01581

508-329-5146